CONTINENTAL CARBONIC PRODUCTS, INC. *v.*
Phillip COHEN

CA 05-1091                                          241 S.W.3d 296

Court of Appeals of Arkansas
Opinion delivered October 11, 2006

*Friday, Eldredge & Clark*, by: *David D. Wilson*, for appellee.

*Taylor Law Firm*, by: *Timothy L. Brooks*, for appellee.

TERRY CRABTREE, Judge. Appellee Phillip Cohen sued his former employer, appellant Continental Carbonic Products, for breach of contract for nonpayment of stock options after his employment terminated. The jury found in favor of Cohen. Continental appeals, contending that the trial court erred in failing to grant its motions for directed verdict and for judgment notwithstanding the verdict and that the trial court erred in admitting evidence to the effect that Continental could not demonstrate any financial harm as a result of Cohen's employment with a competitor. We affirm.

*Background*

Continental manufactures and sells dry ice for use in many different applications. Although the manufacture of dry ice is its primary product line, Continental also sells blasting equipment for use in the cleaning of industrial equipment. In 1991, Cohen became employed by Continental as a salesman. In accepting this position, Cohen signed non-competition agreements with Continental and its subsidiary Dixie Carbonic, Inc. (Dixie). The relevant terms of these agreements had the effect of prohibiting Cohen from going to work for a competitor who sold competitive products within a seventy-five-mile radius of any Continental facility for a two-year period following termination of employment with Continental. On May 17, 2002, Cohen submitted his two-week notice, effectively resigning from Continental as of May 31, 2002. Pursuant to the express terms of the non-competition agreements, Cohen would be prohibited from going to work for a competitor through May 31, 2004.

During his employment with Continental, Cohen received certain stock options. Upon terminating his employment with Continental, Cohen exercised those options. On May 24, 2002, Cohen and Continental entered into a Stock Option Settlement Agreement (the option settlement) whereby the total value of the options was agreed upon, as well as the terms and conditions of the payout for the options. The option settlement contained the following language: "All future payments will be forfeited for any violations of the employee's Confidentiality and Non-Compete Agreements."

A few months out after leaving employment with Continental, Cohen was offered employment with Cold Jet, Inc., a competitor of Continental within the dry-ice industry. Cold Jet's principal business was the manufacture and sale of dry-ice blasting

equipment for use in industrial cleaning applications. Cold Jet also sold pelletized dry ice to its customers for use with the blasting equipment. Continental and Cold Jet also did extensive business with each other.

Cohen accepted the position at Cold Jet, but prior to doing so, he negotiated a limited release of his obligations to Continental. The release contained the following language: "[Continental and Dixie] agree to release Cohen from the Non-Compete Agreements for the sole purpose of allowing Cohen to sell dry ice blasting equipment manufactured by Cold Jet. . . . Other than for the foregoing limited release, the Non-Compete Agreements shall remain in full force and effect. . . ." Cohen sold blasting equipment for Cold Jet until March 29, 2004, when he accepted a promotion to become Cold Jet's vice president of customer-service relations. This position did not involve selling blasting equipment. The position had responsibility to supervise Cold Jet's dry-ice sales staff, and Cohen received a commission on all sales of dry ice.

On May 17, 2004, Continental informed Cohen by letter that he had violated the terms of his non-competition agreement and the release and, therefore, had forfeited the remaining balance due under the terms of the option settlement. The reasons given were the very nature of Cohen's position as vice president of customer-service relations and the few ice referrals received during Cohen's tenure as a blasting equipment salesman. The letter also noted that the agreements between Cohen and Continental prohibited Cohen from arranging any dry-ice sales with any supplier except for Continental.

Cohen filed suit against Continental, alleging that it breached the option settlement agreement to pay Cohen the remaining $49,339.35 owed for his stock options. Continental denied the material allegations of the complaint and also pled that Cohen was in breach of the various agreements.[1]

---

[1] The complaint also included counts that Continental had converted the money belonging to Cohen and had breached its fiduciary duty to him. Finally, the complaint also sought punitive damages. Continental was granted partial summary judgment on these claims. Continental had also filed a counterclaim, alleging that Cohen had breached the non-competition agreements and sought damages for that breach but later moved to voluntarily dismiss its counterclaim. The trial court granted the motion. No issue regarding these matters is raised in this appeal.

*The Evidence*

Phillip Cohen testified that he signed the non-competition agreements and understood them to mean that he could remain in the dry-ice business as long as he remained more than seventy-five miles from a Continental location. He was aware that the option settlement contained a provision that future payments would be forfeited if he violated the non-competition agreement. Cohen said that he understood that the release allowed him to sell equipment for Cold Jet and refer dry-ice sales to Continental. He also stated that, when he was selling blasting equipment for Cold Jet, he referred all customers who wanted dry ice to Continental, where Cold Jet obtained its dry ice, and denied that he sold or arranged the sale of dry ice for anyone other than Continental while employed at Cold Jet. He said that Continental wanted him to work for Cold Jet because he would be referring ice sales to Continental. According to Cohen, there was no Continental facility within seventy-five miles of his home. He said that he was paid like other salesmen, based on a formula including dry-ice sales.

In late March 2004, after Cold Jet acquired ownership of a competitor, Cohen was offered a promotion to vice president of customer-service relations and dealt with all aspects of customer service, including dry ice. He was no longer involved in selling blasting equipment and was not calling on customers trying to sell ice. He said that, after his promotion, he trained a salesman to take over his territory and traveled to California to learn the operations of the newly acquired company. He denied making any sales of ice prior to the expiration of the non-competition agreement. Cohen's compensation included percentages of certain company activities, including dry ice. He denied taking the promotion prior to March 2004.

Three Continental executives, Robert Wiesemann, Continental's chief executive, John Funk, president, and Randy Spitz, vice president and chief financial officer, each testified that they understood the non-competition agreements to prohibit Cohen from working for any company if that other company had employees or a facility within seventy-five miles of a Continental facility, even if Cohen himself were not within that radius of a Continental facility. Wiesemann said that he was responsible for the forfeiture provision in the option settlement. None of the executives had any specific knowledge of any person to whom Cohen solicited the sale of ice or actually sold dry ice after his

promotion. They also said that they did not have personal knowledge of any of Cohen's actions between March 29, 2004, and May 31, 2004, that caused any specific damages or loss of sales to Continental. All three opined that Cohen's taking the promotion itself was a violation of the non-competition agreement and release. They also said that Cohen could not be compensated based on dry-ice sales because that would be a breach of the non-competition agreement but admitted that there was no specific language in the release to that effect.

Gene Cooke, Cold Jet's chief executive, stated his belief that, in executing the release, Cold Jet was not setting Cohen up to compete with Continental; instead, he believed that it would further the close relationship between the companies. He believed that Cohen's sales efforts were going to support Continental's distribution efforts in his territory. He said the offer of employment did not contemplate Cohen's having responsibility for dry-ice sales. He stated that he was unsure whether there was an understanding that Cohen would refer all of Cold Jet's dry-ice sales within his territory directly to Continental, adding that it would have made sense to do so because of the relationship between the companies. Once Continental began directly contacting Cold Jet's clients, Cooke did not involve Cohen in formulating a response to preserve Cold Jet's clients.

Cooke promoted Cohen to vice president of customer-service relations in March 2004 and said that, after the promotion, Cohen had supervisory authority over Pat Frank, the director of Cold Jet's dry-ice sales. He added that, as a result of the promotion, Cohen was given a commission on dry-ice sales. Cooke said that he did not examine the release to determine whether Cohen would be in breach by accepting the promotion but that he called Robert Wiesemann at Continental to alert them to what Cold Jet was planning, though he did not discuss it as a possible violation of the release. He said that it never occurred to him that Cohen's promotion might violate the non-competition agreements or the release. Cooke said that Cohen never attempted to sell or solicit dry-ice business for Cold Jet because Cold Jet had its own department for that activity.

Patrick Frank, a former Cold Jet employee, testified that he was responsible for Cold Jet's dry-ice business. He said that he reported to Cohen after Cohen's promotion to vice president of customer-service relations, which, according to Frank, occurred in January 2004. On cross-examination, Frank admitted that he

never saw Cohen attempting to make dry-ice sales within seventy-five miles of a Continental facility.

At the close of Cohen's case and again at the close of all of the evidence, Continental moved for a directed verdict on the basis that Cohen could not present a *prima facie* case for breach of contract because he himself breached the non-competition agreement. The trial court denied the motions.

As noted above, the jury returned a verdict in Cohen's favor. The parties stipulated that Cohen's damages were $53,840.69, and judgment was entered on the jury's verdict. Thereafter, Continental filed a motion for judgment notwithstanding the verdict (JNOV) or new trial, alleging that the verdict was not supported by substantial evidence. That motion was denied, and Continental now appeals.

### Arguments on Appeal

Continental's first point is that the trial court erred in denying its motions for directed verdict or JNOV. Our standard of review of the denial of a motion for directed verdict is whether the jury's verdict is supported by substantial evidence. *Stewart Title Guar. Co. v. American Abstract & Title Co.*, 363 Ark. 530, 215 S.W.3d 596 (2005). Similarly, in reviewing the denial of a motion for JNOV, we will reverse only if there is no substantial evidence to support the jury's verdict and the moving party is entitled to judgment as a matter of law. *Id.* Substantial evidence is that which goes beyond suspicion or conjecture and is sufficient to compel a conclusion one way or the other. *Id.* It is not this court's place to try issues of fact; rather, this court simply reviews the record for substantial evidence to support the jury's verdict. *Id.* In determining whether there is substantial evidence, we view the evidence and all reasonable inferences arising therefrom in the light most favorable to the party on whose behalf judgment was entered. *Id.*

Continental argues that Cohen failed to present a *prima facie* case for breach of contract because he himself breached the non-competition agreement by taking a promotion where he had oversight responsibility for Cold Jet's dry-ice sales. As a general rule, the failure of one party to perform his contractual obligations releases the other party from his obligations. *American Transp. Corp. v. Exchange Capital Corp.*, 84 Ark. App. 28, 129 S.W.3d 312 (2003). Whether a covenant not to compete has been materially breached

is a factual, not a legal, issue. *Abernathy v. Knych*, 76 Ark. App. 127, 61 S.W.3d 207 (2001); *see also DBA Enters. v. Findlay*, 923 P.2d 298 (Colo. App. 1996).

The jury in this case was instructed that a material breach by one party excuses the performance of the other party and that a breach that is not material does not excuse the performance of the other party. We believe that there was sufficient evidence from which the jury could find that Cohen did not materially breach his agreements. Cohen and Gene Cooke both testified that Cohen did not make or solicit any sales of dry ice while at Cold Jet, other than through Continental. The Continental executives testified that they did not conduct an in-depth investigation into the matter and offered no specific proof of any sales made by Cohen during the two-month period after his promotion. Further, they could not identify the number of sales they missed or the amount of money Continental may have lost as a result of any breach by Cohen. This testimony, if believed, would tend to show that Continental received the benefit of its bargain, an influential circumstance in the determination of the materiality of a breach. *TXO Prod. Corp. v. Page Farms, Inc.*, 287 Ark. 304, 698 S.W.2d 791 (1985); *Vereen v. Hargrove*, 80 Ark. App. 385, 96 S.W.3d 762 (2003).

Continental also argues that Cohen's promotion itself violated the release because, after the promotion, Cohen was not solely selling blasting equipment. However, this was not the reason given Cohen in the letter declaring the forfeiture absolute. Further, it is contrary to the language of the agreements. The non-competition agreement prevents Cohen from working for a competitor selling dry ice within seventy-five miles of a Continental facility. The option settlement contains a forfeiture clause restating the prohibition on Cohen's selling dry ice and providing that "any violation of such prohibition by Cohen shall result in Cohen's forfeiture of his stock option balance. . . ." The release provides that Cohen could work for a competitor, just not selling dry ice. Therefore, the fact that Cohen received a promotion was not, by the plain language used, a material breach of the non-competition agreement.

In its second point, Continental argues that the trial court erred in admitting evidence to the effect that Continental could not show any financial harm as a result of Cohen's employment with Cold Jet. Continental acknowledges that this point concerns

whether Cohen materially breach the agreements and is interwoven with its first point. Therefore, we need not address this point separately.

Affirmed.

HART and GLOVER, JJ., agree.